IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA      :      CRIMINAL ACTION
                              :      NO. 07-75-2
           v.                 :
                              :      CIVIL ACTION
WILLIAM JOHNSON               :      NO. 13-1065


MEMORANDUM

Bartle, J.                                     August 23, 2013

          Before the court is the timely motion of defendant

William Johnson ("Johnson") to vacate, set aside, or correct his

sentence under 28 U.S.C. § 2255.[1]

          Johnson was found guilty by a jury on October 4, 2007

of:  conspiracy to distribute methamphetamine, in violation of 21

U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count One); violent

crimes in aid of racketeering ("VICAR") in violation of 18 U.S.C.

§ 1959(a)(3) (Count Four); possession of a firearm in furtherance

of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)

(Count Six); and two counts of possession of a firearm and

ammunition by a convicted felon, in violation of 18 U.S.C.

§ 922(g)(1) (Counts Seven and Eight).  In response to a special

_____

1.  On February 27, 2013, Johnson filed a non-conforming motion
to vacate, set aside, or correct his sentence under 28 U.S.C.
§ 2255, which included a 94-page memorandum.  On March 15, 2013,
this court ordered the defendant to re-file within thirty days on
the court's standard form for filing a § 2255 petition or the
petition would be rejected.  The defendant filed the standard
form § 2255 motion on April 2, 2013.  We will consider both the
standard form and the previously filed memorandum in our
decision.

interrogatory, the jury determined that Johnson conspired to distribute over 500 grams of crystal methamphetamine.

Johnson was initially sentenced on April 11, 2008. The court found that the combined adjusted offense level under the sentencing guidelines was level 39. The court determined that Johnson was a career offender, and, therefore, he had a criminal history category of VI. This determination was based on Johnson's prior convictions of aggravated assault and simple assault. After a one-level departure for over-representation of his criminal history, the sentencing guidelines prescribed a term of imprisonment ranging from 360 months to life. The court sentenced Johnson to 300 months on Counts One, Four, Seven, and Eight, followed by a consecutive 60 months on Count Six.

Johnson appealed to the Third Circuit, raising a number of issues. The Court of Appeals rejected all but one. It determined that Johnson was not a career offender[2] and ordered a new sentencing hearing on that issue. On August 31, 2010, Johnson was re-sentenced by this court to 348 months imprisonment, one year lower than his initial sentence. The court credited Johnson for obtaining a GED in prison. The sentence also included a term of supervised release of five years, forfeiture of specific tangible property, a special

---

2. Our Court of Appeals had previously concluded that simple assault under Pennsylvania law qualified as a crime of violence, but its prior determination no longer stood following the Supreme Court's decision in United States v. Begay, 553 U.S. 137 (2009), which was handed down after this court sentenced Johnson.

assessment of $500, and joint and several forfeiture with his co-defendants of $6 million.  Johnson's subsequent appeal was rejected.  <u>United States v. Johnson</u>, 432 F. App'x 86 (3d Cir. 2011).  His petition for a writ of certiorari was denied by the Supreme Court on February 27, 2012.  <u>United States v. Johnson</u>, 132 S. Ct. 1649 (2012).

Johnson alleges in his § 2255 motion that he was deprived of his Sixth Amendment right to effective assistance of counsel through a series of errors made by his attorney during the trial.  His motion is based on the grounds that his trial counsel was ineffective:  (1) in not conducting a pre-trial investigation of law and facts relevant to the government's Title III wiretap affidavits; (2) in failing to provide Johnson with information about pursuing an open guilty plea or a plea bargain in lieu of proceeding to trial; (3) in not demanding that Johnson be confronted with witnesses against him; (4) in not requesting that a voir-dire of the jury take place during trial after one of the jurors interrupted the proceedings; (5) in not conducting a pre-trial investigation of certain key witnesses and not calling those witnesses to testify; and (6) in allowing the court to determine forfeiture instead of the jury.

On August 16, 2013, the court held an evidentiary hearing limited to issues involving plea discussions among Johnson, his trial counsel, and the government, including whether Johnson's trial counsel failed to advise him that he could enter a guilty plea without a plea agreement.  At this hearing, Noah

Gorson, Andrea Foulkes, Kishan Nair, and Johnson testified.  Noah
Gorson was Johnson's trial counsel, and Andrea Foulkes and Kishan
Nair were the prosecutors who tried the case.

I.

The underlying facts, in the light most favorable to
the government, are as follows.  Between January 2003 and June
2006, Johnson's co-defendant John Napoli ("Napoli") organized and
led a racketeering enterprise, known as the Pennsylvania Chapter
of the Breed Motorcycle Gang ("Breed").  This organization,
located in Bristol, Pennsylvania, was a hierarchical motorcycle
gang with a strict authoritarian leadership.  The Breed gang
trafficked 125 pounds of crystal methamphetamine over that three-
year period and engaged in several violent acts in furtherance of
the enterprise.

From mid-2005 through June 2006, the Bureau of
Narcotics Investigation in the Office of the Pennsylvania
Attorney General investigated the Breed.  The investigation
included state court-authorized wiretaps of two telephones used
by Johnson and one telephone used by Napoli from April 13, 2006
and June 13, 2006.

From approximately March 2006 through June 2006,
Johnson became the principal supplier of methamphetamine to the
Breed.  He obtained approximately 22 pounds of crystal
methamphetamine from his drug supplier, Robert Traverse, in that
four-month period.  Napoli directed that the methamphetamine from

Johnson be distributed to numerous mid-level distributors inside the Breed.

To protect his methamphetamine supplies, Johnson, who was a previously convicted felon, kept firearms and ammunition at his two residences, which were located at 3632 Morrell Street and 4648 Bergen Street in Philadelphia. He also stored drugs and drug proceeds at these residences. On June 5, 2006, during a search at 3632 Morrell Street, agents found a Kel-Tec 9mm handgun loaded with 13 rounds of ammunition within reach of approximately five pounds of crystal methamphetamine. At 4648 Bergen Street, agents discovered a 12-gauge pump-action shotgun next to Johnson's Breed "colors" in the bedroom closet and a loaded .44 caliber Charter Arms revolver in a bedroom drawer.

During the state investigation, confidential informant (later, cooperating witness) David Serviolo ("Serviolo") made controlled small drug purchases from Johnson. On one occasion, in March 2006, Serviolo arrived at 3632 Morrell Street and saw Johnson with a handgun in one hand and putting cash into a portable safe with the other. On May 11, 2006, Johnson asked Serviolo to help him move several firearms and approximately one pound of methamphetamine from his Morrell Street residence to his Bergen Street residence. In addition, cooperating witness Eric Loebsack ("Loebsack") observed Johnson with a firearm when he picked Johnson up at his Morrell Street residence for a "Hooters Bike Night" event. After that event, Loebsack picked up methamphetamine from Johnson's Morrell Street residence.

Within the Breed gang, violence was frequently used to ensure loyalty and compliance with orders from leadership. On November 24, 2005, along with other Breed members, Napoli, Johnson, and Christopher Quattrocchi ("Quattrocchi"), a cooperating government witness, brutally beat past Breed president James Graber ("Graber") based on Napoli's belief that Graber had stolen money from a game machine in the gang's clubhouse. This organized assault and battery was formally approved by the "Breed Executive Board" a week in advance. During the beating, Quattrocchi pushed Graber down from behind, Johnson stomped on Graber's chest "like an accordion," and Napoli and Johnson stabbed and beat Graber with pool sticks and other items. The beating resulted in Graber spending four days in the intensive care unit of the hospital with damage to his back, head, liver, and spleen.

Co-defendants Napoli, Johnson, and Thomas Heilman ("Heilman") were tried together during a twelve-day jury trial. Johnson was represented by Noah Gorson at trial and his first sentencing hearing. On his appeal, his second sentencing hearing, and for this motion, he has been represented by Stephen P. Patrizio. The government called 35 civilian and law enforcement witnesses, including eight cooperating coconspirators who testified to Johnson's involvement in drug distribution as well as the Breed's drug financing and violent methods.

II.

Johnson alleges in his § 2255 motion and memorandum of law that he was deprived of his Sixth Amendment right to effective assistance of counsel as a result of six errors made by his counsel during trial and sentencing. Under the Strickland standard for constitutional ineffective assistance of counsel, Johnson bears the burden of proving that: (1) his counsel's performance was deficient; and (2) he suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 687-96 (1984); United States v. Nino, 878 F.2d 101, 103 (3d Cir. 1989). Our scrutiny of counsel's performance is highly deferential in that we presume counsel's actions were undertaken in accordance with professional standards and as part of a "sound trial strategy." Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

The first prong requires that "[counsel's] performance was, under all the circumstances, unreasonable under prevailing professional norms." United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). Under the second prong, Johnson must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." Id. When ruling on a § 2255 motion, the court may address the prejudice prong first "and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006).

III.

We will now address each of the errors alleged by Johnson. He first contends that his trial attorney was ineffective because he did not conduct a pre-trial investigation of law and facts relevant to the government's Title III wiretap affidavits. Johnson alleges that if his counsel had done so, he would have realized that the affidavit contained boilerplate language from a previous wiretap affidavit which Agent Kirk Schwartz ("Agent Schwartz") completed in an unrelated investigation and therefore did not satisfy the necessity requirement. Johnson's argument that the wiretap affidavit was composed of boilerplate language was addressed by our Court of Appeals in Johnson's direct appeal. The Court of Appeals explained:

> When compared, the necessity sections in each wiretap affidavit are noticeably similar. Evidence that two wiretap affidavits are similar, however, is not sufficient to warrant a <u>Franks</u> hearing because it does not speak to whether these statements are false. Therefore, Johnson has not met the first prong of the preliminary showing for a <u>Franks</u> hearing, i.e. demonstrating that there is a false statement or omission.

<u>United States v. Heilman</u>, 377 F. App'x 157, 181 (3d Cir. 2010) (citations omitted).

The Court of Appeals further determined that the affidavits did not rely on boilerplate recitations but rather contained "detailed descriptions" of why traditional "investigatory tools would be insufficient in <u>this</u> case."

Heilman, 377 F. App'x at 186 (emphasis in original).  The court
concluded, "[t]hus, we agree with the Government that a plain
reading of the affidavits belies Defendants' claims that the
affidavits did not contain a full and complete statement of
necessity."  Id.  Accordingly, Johnson's contention fails.  His
attorney's argument on this point would have been futile since
the Court of Appeals addressed the arguments regarding
boilerplate language but concluded that the wiretap affidavits
were sufficient.  Under Strickland, Johnson was not prejudiced.

 Johnson next contends that his trial counsel was
ineffective in advising him with regard to pursuing an open
guilty plea, a plea bargain, or proceeding to trial.  Johnson
makes several arguments in this regard.  First, he maintains that
his trial counsel was ineffective for not bringing to the
government's attention that Johnson was not a career offender.
Even if true, Johnson cannot prove any prejudice under
Strickland.

 A defendant is a career offender if:  (1) he or she was
at least 18 at the time of the instant offense; (2) the instant
offense is a felony conviction for either a crime of violence of
a controlled substance offense; and (3) he or she has at least
two prior felony convictions for either a crime of violence or a
controlled substance offense.  U.S.S. G. § 4B1.1; Heilman, 377 F.
App'x at 218.

 This court originally determined that Johnson was a
career offender based on an aggravated assault conviction and a

simple assault conviction.  Johnson disputed the characterization
of the simple assault conviction as a crime of violence, but our
Court of Appeals had previously concluded that a Pennsylvania
simple assault qualified as a crime of violence in United States
v. Dorsey, 174 F.3d 331, 333 (3d Cir. 1999).  Thus, under the law
in the Third Circuit as it stood at the time of Johnson's trial
and sentencing, he was a career offender.  However, as noted
above, United States v. Begay, 553 U.S. 137 (2009), which was
decided after Johnson's sentencing, established a new framework
for identifying a crime of violence, and our Court of the Appeals
vacated Johnson's sentence and remanded for re-sentencing based
on this intervening change in the law.  Accordingly, Johnson's
claim that his counsel was ineffective in failing to argue that
Johnson was not a career offender is without merit because such
an argument would have been futile at the time.

Johnson also contends that he would have accepted "the
promising offer [by the government] of a number somewhere around
17 years" but that his trial attorney did not pursue further
negotiations.  At the August 16, 2013 hearing on this issue, Noah
Gorson ("Mr. Gorson"), Johnson's trial counsel, testified that
Johnson made it clear that he would never enter into a
cooperation plea agreement with the government and would not
plead guilty unless he was assured of a sentence of no more than
five to seven years.

Andrea Foulkes ("Ms. Foulkes"), the assistant United
States Attorney at the trial, testified at the hearing that she

did have plea discussions with counsel for all three defendants during or right before voir dire.  In order to avoid a long and expensive trial, she offered the defendants a "universal C-plea"[3] with each to serve the following number of years:  25 years for Napoli, 22 years for Johnson, and 18 years for Heilman.[4]  The offer had to be accepted by all three defendants to be effective. If not, it would be void.

Ms. Foulkes stated that all defense counsel advised her that all the defendants rejected that offer.  Mr. Gorson confirmed that testimony.  He stated that he and counsel for Napoli and Heilman explained the government's offer to their

_____

3.   Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure provides in relevant part:

> If the defendant pleads guilty ..., the plea
> agreement may specify that an attorney for
> the government will ... agree that a specific
> sentence or sentencing range is the
> appropriate disposition of the case, or that
> a particular provision of the Sentencing
> Guidelines, or policy statement, or
> sentencing factor does or does not apply
> (such a recommendation or request binds the
> court once the court accepts the plea
> agreement).

Significantly, the court is not required to accept a "C" plea. See Fed. R. Crim. P. 11(c)(3)(A).

4.   Johnson's trial attorney recalled at the hearing that this universal C-plea offer involved lower sentences, that is, a 17-year sentence for Napoli, a 13-year sentence for Johnson, and a 10-year sentence for Heilman.  The government disputed this and testified it would have never agreed to such sentences.  We find the government's testimony more credible.  In any event, the government's offer did not stand unless all three defendants accepted, and they did not do so.

clients, and all three rejected it.  While Johnson testified that
he had never heard about this universal C-plea offer until he
read the government's response to his § 2255 motion, we find his
recollection to be faulty.  His trial counsel did not renew
discussions with Johnson after the rejection of the universal C-
plea concerning any guilty plea without a plea agreement.

There was also testimony at the hearing about a plea
discussion which would involve the turning over of a 50 caliber
firearm which Johnson allegedly possessed or of which he knew the
whereabouts.  It was not clear whether the government approached
Johnson's trial counsel about a possible plea in exchange for
Johnson's cooperation, including the recovery of this firearm, or
whether Johnson asked his counsel to talk to the government about
this possibility.  The government was interested in getting this
large firearm off the streets.  Ms. Foulkes testified that the
government would not enter into a plea agreement with Johnson
involving the firearm unless he cooperated by providing the
firearm as well as additional information.  Johnson, however,
resolutely refused to cooperate.  He was willing only to provide
for the anonymous delivery of the firearm upon agreement for a
sentence of not more than five to seven years.  At the recent
hearing, Johnson took a different tack.  He stated that the
firearm never existed.

In sum, Johnson was not going to cooperate and was bent
on exercising his right to trial unless he was assured of a
sentence of no more than seven years.  It is undisputed that the

government would never have agreed to such a lenient sentence based on the serious crimes charged.  Nor would the court have ever accepted a plea agreement with such a light sentence had the government urged it.  <u>See</u> Fed. R. Crim. P. 11(c)(1)(C). Johnson's trial counsel advised him of all his options:  to cooperate with the government, to make an open plea without cooperation, or to go to trial.  His trial counsel had also advised Johnson that he was facing a possible life sentence and a mandatory minimum sentence of fifteen years.  Johnson knowingly and voluntarily chose to go to trial.

Johnson's third and fifth arguments relate to the VICAR charge in Count Four of the Second Superseding Indictment, which was based on the beating of Graber described above.  Johnson contends that his trial counsel was ineffective and thus that his constitutional rights of confrontation were violated because the victim of the crime, that is Graber, did not testify at trial.

Johnson cites to <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009) for this proposition.  However, this case is not relevant to the facts before us.  It held that the introduction of certificates of state laboratory analysts identifying material seized by police as cocaine of a certain quantity violated a defendant's Sixth Amendment right to confront the witnesses against him.  <u>Id.</u> at 322.  This case has nothing to do with whether victims must testify at trial.

The decision whether to call a particular witness is generally a strategic choice made by counsel and is entitled to a

"heavy measure of deference." Strickland, 466 U.S. at 690-91.
To rise to the level of ineffective assistance of counsel, there
must be a clear showing that the testimony would have been
material and favorable.  Id.; see also United States v. Gray, 878
F.2d 702, 711 (3d Cir. 1989).

Graber testified before the grand jury that he had no
memory of the actual assault on him.  Accordingly, he could not
have provided any material information at trial about what
happened during the assault and could not possibly have
exonerated Johnson.  Johnson has not come forward with any
evidence or argument that would cause us to find that Graber's
testimony would have been favorable for him.  Accordingly, his
trial counsel was not ineffective in deciding not to call Graber
to testify.[5]

Johnson also contends that his trial counsel was
ineffective and his constitutional rights of confrontation were
violated because his trial counsel did not object to the
government's decision to present its evidence of the Graber
beating through the testimony of Quattrocchi, Loebsack,
Jacqueline Graber (the wife of James Graber), and Serviolo.  The
testimony of these witnesses, along with Graber's hospital
medical records, provided sufficient evidence for the jury to
find that Johnson was involved in Graber's beating.  Quattrocchi

_____

5.  The law, of course, does not require the prosecution to call
all persons who may have some knowledge of the matter in issue.
United States v. Holmes, 470 F.2d 225, 229-30 (3d Cir. 1972).

was present at the beating and at the Breed meeting prior to the beating at which the Breed members voted to oust Graber and beat him up. He testified as to Johnson's role. Specifically, Quattrocchi stated on the witness stand that Johnson "threw some ... punches and a couple kicks" and "stomped on [Graber] real good. Less kick, more of a stomp. It stuck out in my head because I remember [Graber] looked, kind of, like an accordion. He just compressed." Loebsack was present after the beating and testified as to Graber's condition. He stated:

> I remember walking in, seeing [Graber] laying
> in the hall.... His eyes are -- his eyes were
> -- he was beaten, his eyes were swollen shut.
> I don't remember what arm it was, but one of
> his arms was deformed. And there was blood
> on the floor, there was blood on him, and he
> was bleeding from his head.

Jacqueline Graber observed her husband's injuries after he was brought home. She described them, including that he had a footprint on his back "[l]ike somebody stomped on it." She identified items taken from her residence after the beating.

Serviolo testified about the Graber beating. All he said, when asked if he was aware of what happened to Graber, was "He got beat up and his things taken and he got stabbed in the head with a screwdriver." There would have been no legitimate basis for Johnson's trial counsel to have objected to the testimony of any of these witnesses.

Johnson also contends that his trial attorney ineffectively cross-examined these witnesses because he did not ask Quattrocchi, Loebsack, or Serviolo specific questions about

the beating, and he did not ask Jacqueline Graber any questions at all.  We are not persuaded.

Johnson's trial attorney instead focused on the government's case involving the drug distribution charge and firearm charges.  These offenses had a more serious effect on the sentencing guidelines than the Count Four VICAR Charge, which did not add to Johnson's guidelines range.  Nevertheless, Johnson's trial attorney did engage in meaningful cross-examination and put on a strong defense at trial on the VICAR charge.  Johnson's trial attorney also collaborated with the attorneys of Johnson's co-defendants, Napoli and Heilman.  For example, Napoli's trial counsel cross-examined Quattrocchi before Johnson's trial attorney.  Napoli's trial counsel elicited the following exchange about the Graber beating:

> Q: Okay.  And that beating was because he was stealing money from a machine inside the club, correct?
>
> A: Yeah.  To my understanding it was because he was robbing the touch machine, that's right.
>
> Q: Okay.  So that incident and his beating had nothing to do with drugs or methamphetamine or any illegal enterprise or anything of the sort, correct?
>
> A: Not that I know of.

This testimony was helpful because it had the potential to raise reasonable doubt in the minds of the jurors about whether the beating was in furtherance of the Breed's racketeering activities, as required for the VICAR charge.  Rather than

eliciting cumulative testimony, Johnson's trial counsel made the strategic decision to question Quattrocchi about his lack of credibility and his bias against Johnson.  This was not ineffective assistance of counsel under <u>Strickland</u>.

Napoli's attorney cross-examined Loebsack along the same lines as with Quattrocchi, and Loebsack stated that Graber was beaten because he stole, not because of anything having to do with the drug distribution scheme.  This was again helpful testimony for all the defendants, including Johnson.  Napoli's attorney also cross-examined Loebsack about the benefits he was getting by testifying against the defendants, which harmed his credibility.  Johnson's counsel then cross-examined Loebsack extensively.  He questioned him about his drug use and discrepancies in his testimony to the grand jury to attack his credibility.  As for Jacqueline Graber, there was no reason for Johnson's attorney to cross-examine her.  She testified about her husband's injuries and the items taken from her home.  She was credible, and these facts were not disputed.  Since Serviolo scarcely discussed the Graber beating itself, there would have been no reason to cross-examine him on this topic.

Johnson further contends that his trial attorney did not sufficiently examine the facts of the Graber beating because Jacqueline Graber testified about a stab wound to Graber's head that did not exist, and his attorney should have cross-exmained her on this point.  However, contrary to Johnson's characterization, Graber's hospital records reveal that he had

incurred a "[c]losed head injury / concussion with subdural hemorrhage around the peritentorial area, scalp laceration and forehead laceration." Jacqueline Graber's description of a stab wound to Graber's head was consistent with the medical records, and there would have been no cause for Johnson's trial attorney to cross-examine her about this. Indeed, it was a quite reasonable decision on the part of Johnson's trial counsel not to prolong the questioning on the vicious beating of Graber.

Johnson then argues that his trial counsel was ineffective because he did not conduct a pre-trial investigation of certain key witnesses and did not call those witnesses to testify. Here Johnson refers to co-conspirator Kenneth Steinmuller, who was originally on the government's witness list but not called.[6] Johnson maintains that Steinmuller's grand jury testimony shows that his testimony at trial would have had an exonerating effect. We disagree. Steinmuller testified in the grand jury that he did not witness the Graber beating. Rather, he "observed the finished product when he was done being beaten." When asked if Johnson was present at the beating, Steinmuller stated, "I believe Billy [Johnson] was there, but I don't know if he was involved. He might have came in when I came in." This testimony would not have raised reasonable doubt in a reasonable jury. It merely establishes that Steinmuller was not present during the beating and thus does not know if Johnson was.

---

6. Johnson also mentions the name of James Fostinis but makes no argument that his testimony would have been favorable to Johnson.

Johnson was not prejudiced by his counsel's strategic decision
not to call Steinmuller to the stand.

The best argument the defense had with regard to the
Graber beating at issue in the Count Four VICAR charge was that
it was not in furtherance of racketeering and that is what the
attorneys argued. Johnson's counsel may not have been
successful, but he was not constitutionally ineffective under
Strickland.

Johnson also contends that his trial counsel was
ineffective in not requesting that the voir dire of the jury
occur in the middle of trial after one of the jurors interrupted
the proceedings. He refers to an incident that occurred during
the testimony at trial of Agent Schwartz. A juror interrupted to
ask the court to remove the Bible on the witness stand from
underneath contraband evidence consisting of multiple drugs and
firearms. Johnson argues that this request demonstrates that
juror's bias or prejudice against him and thus that his trial
counsel was ineffective for failing to object and request that
the court conduct a voir dire to determine whether the jury's
impartiality was affected. We disagree.

The juror's request does not demonstrate any bias or
prejudice against the defendant. Rather, it merely shows that
the juror expressed disapproval of the government's purported
insensitivity. Indeed, the cases cited by Johnson do not relate
to the facts at hand. In Government of the Virgin Islands v.
Weatherwax, on which he relies, the jurors considered an

inaccurate newspaper article about the case before them while
deliberating.  20 F.3d 572, 576-77 (3d Cir. 1994).  That
situation was likely to prejudice the defendant, unlike the
juror's request here.  In United States v. Resko, the other Third
Circuit case cited by Johnson, the jurors violated the court's
instructions by discussing the case during trial.  3 F.3d 684,
686 (3d Cir. 1993).  This led to the possibility that the jury
would make a decision before hearing all the evidence and that
the defendant could be prejudiced as a result.  Unlike Weatherwax
and Resko, there is no evidence here of possible juror
misconduct, and there is no presumption that any juror would be
biased against the defendant because of one juror's request.  We
must proceed on the assumption that the jury "reasonably,
conscientiously, and impartially appl[ied] the standards that
govern the decision."  Strickland, 466 U.S. at 695.  Johnson has
simply not provided any evidence that shows that any juror would
have been prejudiced against him because of the contraband on top
of the Bible or the request to move it.  If anything, the
presence of the Bible under the government's evidence would have
prejudiced the government.

It is Johnson's final argument that trial counsel was
ineffective in allowing the court to determine forfeiture instead
of the jury.  Rule 32.2 of the Federal Rules of Criminal
Procedure governs forfeiture.  In relevant part, it provides:

> (5) Jury determination.
>      (A) Retaining the jury.  In any case
> tried before a jury, if the indictment or

information states that the government is
seeking forfeiture, the court must determine
before the jury begins deliberating whether
either party requests that the jury be
retained to determine the forfeitability of
specific property if it returns a guilty
verdict.
          (B) Special verdict form.  If a party
timely requests to have the jury determine
forfeiture, the government must submit a
proposed Special Verdict Form listing each
property subject to forfeiture and asking the
jury to determine whether the government has
established the requisite nexus between the
property and the offense committed by the
defendant.

Fed. R. Crim. P. 32.2(5).

        The Supreme Court has held that forfeiture provided for

in various criminal statutes is punishment and not an element of

an offense.  See Libretti v. United States, 516 U.S. 29, 41

(1995).  Specifically, it stated:

        Without disparaging the importance of the
        right provided by [the Federal Rules of
        Criminal Procedure], our analysis of the
        nature of criminal forfeiture as an aspect of
        sentencing compels the conclusion that the
        right to a jury verdict on forfeitability
        does not fall within the Sixth Amendment's
        constitutional protection.  Our cases have
        made abundantly clear that a defendant does
        not enjoy a constitutional right to a jury
        determination as to the appropriate sentence
        to be imposed.

Id.  Thus, Johnson's argument that his counsel was

constitutionally ineffective under Strickland fails.

                              IV.

        Accordingly, Johnson has not established that his trial

counsel's performance was unreasonable under prevailing

professional norms or that he was prejudiced in any way by his

counsel's performance.  <u>Strickland</u>, 466 U.S. at 687-91; <u>Day</u>, 969 F.2d at 42.  For the above reasons, Johnson's motion under § 2255 will be denied.  A certificate of appealability will not issue.